## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | | |
|---|---|---|
| BURNELL GRANT, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 1:15-CV-15 (WLS) |
| | : | |
| HOSPITAL AUTHORITY OF MILLER | : | |
| COUNTY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

### ORDER

Present before the Court is Defendant Hospital Authority of Miller County's Motion for Summary Judgment (Doc. 13) and Request for Oral Argument.  (Doc. 20.)  Therein, Defendant requests summary judgment in their favor on all claims raised in Plaintiff Burnell Grant's Complaint.  (*See* Doc. 1.)  For the following reasons, Defendant's Motion for Summary Judgment (Doc. 13) is **GRANTED** and Request for Oral Argument (Doc. 20) is **DENIED AS MOOT.**

### PROCEDURAL HISTORY

On January 22, 2015, Plaintiff Burnell Grant (hereinafter "Grant" or "Plaintiff") brought suit against Defendant Hospital Authority of Miller County (hereinafter "the Hospital Authority" or "Defendant") for alleged violations of the Americans with Disabilities Act ("ADA") of 1990, as amended, 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act ("FMLA") of 1993, 29 U.S.C. § 2601 *et seq.*  Defendant timely answered the Complaint on February 23, 2015.  (*See* Doc. 4.)  Defendant raised numerous affirmative defenses and denied Plaintiff's allegations that he was discriminated against on the basis of an actual or perceived disability or that Plaintiff was denied any FMLA rights.  (*See id.*)

On November 17, 2015, Defendant filed motion for summary judgment as to all of Plaintiff's claims.  (Doc. 13.)  Defendant also filed a request for oral argument in connection with their summary judgment motion on the same day.  (Doc. 20.)  Plaintiff timely

responded to the motion on December 3, 2015 (Doc. 21), and Defendant timely replied thereto on December 17, 2015.  (Doc. 22.)   As the movant for summary judgment, Defendant has complied with M.D. Ga. L.R. 56 by attaching separate and concise statements of material fact to their motion (*see* Doc. 13-4), and Plaintiff has also complied by attaching separate and concise statements of material fact and by responding to each of Defendant's statements of material fact.  (*See* Doc. 21-1.)   Although not required by the Local Rules, Defendant has also responded to each of Plaintiff's statements of material fact.  (*See* Doc. 23.)   As such, the Court finds that Defendant's Motion for Summary Judgment (Doc. 13) is ripe for review.

## FACTUAL HISTORY

### I.  Introduction

The following facts are derived from the Complaint (Doc. 1), the Answer (Doc. 4), Defendant's Statement of Material Facts, for which there is no genuine issue of fact to be tried (Doc. 13-4), Plaintiff's Statement of Material Facts, for which there is a genuine issue of fact to be tried, and Response to Defendant's Statement of Material Facts (Doc. 21-1), and Defendant's Response to Plaintiff's Statement of Material Facts (Doc. 23), all of which were submitted both in compliance with and beyond what is required of M.D. Ga. L.R. 56, and the record in this case.  Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits submitted, all of which are construed in a light most favorable to the nonmoving party.  *See* FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### II.  Relevant Facts

The Hospital Authority of Miller County operates a critical access, non-profit medical facility located in Colquitt, Georgia, and provides a full range of inpatient and outpatient medical services to the residents of Southwest Georgia.  (Doc. 13-4 at ¶ 1.)  Burnell Grant first joined the Hospital Authority in 1979 as a Certified Nursing Assistant (CNA).[1]  (Doc. 21-1 at ¶¶ 1-2.)  He had been with the Hospital Authority ever since he left high school.

---

[1] Grant was laid off once by the Hospital Authority, but was rehired as a CNA on February 11, 1999.  (Docs. 13-4 at ¶ 9; 17 at 11.)

(Doc. 17 at 10.)  Over time, he was promoted to various supervisory roles and finally to Housekeeping Supervisor in 2004.  (Doc. 21-1 at ¶ 4.)

As Housekeeping Supervisor, Grant oversaw 12 to 14 members of the housekeeping staff in the performance of their jobs to ensure that the high standards for hospital cleanliness were met.  (Docs. 13-4 at ¶ 11; 21-1 at ¶ 5.)  His supervisory duties included managing personnel, giving daily assignments, ensuring his staff complete required paper work, and confirming that assigned tasks were being performed.  (Doc. 13-4 at ¶ 12.)  In addition to his supervisory role, Grant personally performed custodian duties such as cleaning and mopping within the Hospital and the nursing home facility.  (*Id.* at ¶ 13.)

Notwithstanding his long career with the Hospital Authority, Grant suffers complications with diabetes.  (Doc. 21-1 at ¶ 12.)  He describes himself as a "bad diabetic." (Doc. 17 at 43.)  This meant that his vision would be severely impacted depending upon how high or low his sugar levels were that day.  (*Id.* at 45.)  He would experience significantly blurred vision to the point where he could not read words on paper.  (*Id.*)  He stated that his sugar levels were the reason he "couldn't do the job" or "perform everything they wanted [him] to perform on."  (*Id.*)  He stated, "I couldn't really see, period, hardly.  I could see shadows or something like that . . . ."  (*Id.* at 48.)  Even with these admissions, he maintains that he was still able to do his job and inspect his staff's work.  (*Id.* at 46.)  To compensate for his vision problems, Grant would perform his duties by feel, habit, and routine.  (*Id.* at 48.)  He touted, "There's a way to get by anything."  (*Id.*)

In May or June 2013, DNV Healthcare, Inc. ("DNV") conducted an inspection ("the DNV Survey") of the Hospital Authority.  (Doc. 13-4 at ¶ 18.)  DNV Healthcare, Inc. is a hospital accreditation provider that has been approved by the U.S. Centers for Medicare and Medicaid Services ("CMS") to accredit acute care hospitals in the United States as well as critical access hospitals, like the Hospital Authority.  (*Id.* at ¶ 19.)  The DNV Survey is an essential requirement for the Hospital Authority's accreditation by CMS as a critical access hospital.  (*Id.* at ¶ 20.)  Accreditation as a critical access hospital is vital to the Hospital Authority's participation in the Medicare program.  (*Id.* at ¶ 21.)

The DNV Survey is a rigorous, thorough inspection of all the Hospital Authority's areas, including the Housekeeping Department, which was under Grant's direct supervision.

(Doc. 13-4 at ¶ 22.)   The DNV Survey identified several critical deficiencies in Grant's department.   (*Id.* at ¶ 23.)   The deficiencies in Grant's department were significant to the DNV Survey because it reviewed the overall cleanliness of the Hospital as well as the procedures implemented by the Hospital and the ability of the department to control the spread of infections and diseases within the hospital.   (*Id.* at ¶ 24.)   At the conclusion of the DNV Survey, all of the Hospital Authority managers and administrators had an "exit meeting" with the surveyors to discuss the noted deficiencies that would require correction.   (*Id.* at ¶ 25.)   After the meeting, DNV submitted a written report of its findings to the Hospital Authority and gave them ten (10) days to develop a plan to correct the noted deficiencies.   (*Id.* at ¶¶ 26-27.)   The Hospital Authority submitted the final plan of correction to DNV for approval.   (*Id.* at ¶ 28.)

On July 12, 2013, Robin Rau, CEO of the Hospital Authority, Keith Lovering, Grant's immediate supervisor, and Karie Spence, Human Resources Director, all met with Grant to review the deficiencies noted by DNV within Grant's department and to review the approved final plan of correction.   (Doc. 13-4 at ¶¶ 28-29.)   During the meeting, Grant was presented with the Performance Improvement Plan, which Grant agreed encompassed areas for which he was responsible as Housekeeping Supervisor.   (*Id.* at ¶ 31.)   It is undisputed that Grant's vision was a topic of discussion in this meeting.   (Docs. 13-4 at ¶ 32; 21-1 at ¶ 11.)   However, it is disputed whether Grant's vision impacted his ability to perform his duties.   (*Compare* Doc. 13-4 at ¶ 32 *with* Doc. 21-1 at ¶ 15.)   At most, Grant concedes his vision problems affected his ability to do computer work, but he was otherwise able to perform his other duties.   (Doc. 21-1 at ¶ 15.)

The Hospital Authority contends it decided to explore options to assist Grant, but Grant contends that he was given no options and forced out of the workplace.   (Docs. 13-4 at ¶ 37; 21-1 at ¶ 37.)   The Parties also dispute whether Grant stated during the meeting that he "might as well resign" due to his vision problems.[2]   (Docs. 13-4 at ¶ 36; 21-1 at ¶ 36 "Part II".)   The Parties agree, however, that attempting to place Grant on disability was discussed as an option.   (Docs. 13-4 at ¶ 39; 21-1 at ¶ 37.)   Grant did not return to work after the July

---

[2] On the Hospital Authority's "Separation Notice," it was noted that Grant "voluntarily resigned on 7/29/13."   (Doc. 13-3 at 133.)   Grant states that he never voluntarily resigned.   (Doc. 21-1 at ¶ 47.)   Grant began his leave on July 29, 2013.

12, 2013 meeting. (Doc. 13-4 at ¶ 44.) On July 26, 2013, Grant met with his treating provider, Dr. Roy Reardon, who excused him from work "until further notice."[3] (*See* Doc. 13-3 at 131.)

Grant was placed on paid leave on July 29, 2013. (Doc. 13-3 at ¶ 19.) During his leave, Grant underwent at least three eye surgeries to correct his vision. (Doc. 17 at 64-65.) Although Grant stated that he was never offered FMLA leave, he was aware of the Hospital Authority's FMLA policies and procedures outlined in the employee handbook he received on October 2, 2009. (Docs. 13-4 at ¶¶ 5, 41-42; 17 at 70.) He also recalled seeing at least one FMLA poster in a common area. (Doc. 17 at 71.) At no time, despite previously receiving documentation regarding the Hospital Authority's FMLA policy, did Grant apply for or request FMLA paperwork. (Doc. 13-4 at ¶ 43.) Grant believed that FMLA leave was supposed to be either given to him or offered to him. (Doc. 21-1 at ¶ 57.) He believed that it would "kick in" after his accrued leave was exhausted. (*Id.* at ¶ 58.)

The Hospital Authority's FMLA policy mirrors the federal statute, as it provides up to twelve (12) weeks of family and medical leave during any twelve (12) month period to eligible employees. (*See* Doc. 13-3 at 50-55.) The procedure requires employees to complete a FMLA leave request form, provide a statement of medical necessity for intermittent leave, and report on a monthly basis an intent to return to work. (*Id.* at 52.) It also requires employees on leave to utilize all accrued paid leave during their FMLA leave. (*Id.* at 53.) This requirement is reiterated in the "Paid Time Off Program" policy. (*Id.* at 104.) Upon receiving the employee request, the Hospital Authority must designate leave as FMLA and notify the employee of the designation. (*Id.* at 53.)

Grant exhausted his paid leave on December 27, 2013. (Doc. 13-4 at ¶ 47.) During this time, the Hospital Authority provided Grant with $17,672.20 in compensation and benefits, including health benefits, in the twenty-two (22) weeks between July 29, 2013 and December 27, 2013. (*Id.* at ¶ 48.) This constituted an overpayment of benefits by the sum total of $8,134.00. (*Id.* at ¶ 49.) Grant never attempted to return to work during his paid leave period. (*Id.* at ¶ 54.) The Hospital Authority's policy on job abandonment or

---

[3] Grant contends this note was somehow engineered or ordered at the direction of Robin Rau. (*See* Doc. 21-1.)

voluntary termination is an employee's failure to report to work in two (2) consecutive days without notice.  (*Id.* at ¶ 50.)  Grant admits that he did not attempt to return to work until December 2013 or January 2014.  (*Id.* at ¶ 55.)  On January 8, 2014, the Hospital Authority formally separated Grant from employment.  (*Id.* at ¶ 51.)

Grant obtained a doctor's note to return to work on January 7, 2014.  (Doc 13-4 at ¶ 52.)  The Hospital Authority contends it was unaware Grant had been medically cleared when it issued Grant's formal separation notice.  (*Id.* at ¶ 53.)  Grant did not provide any documentation to show the Hospital Authority he had been cleared to return to work until after January 8, 2014.  (*Id.* at ¶ 56.)  In late January 2014, after being formally separated from employment, Grant asked the Hospital Authority if he could return to work as a CNA.  (*Id.* at ¶ 57.)  At the time, the Colquitt location did not have any CNA positions available.  (*Id.* at ¶ 58.)  However, a CNA position was available at their Edison location, which was thirty (30) minutes form the Colquitt facility.  (*Id.* at ¶ 59.)  This position was offered to Grant.  (*Id.* at ¶ 60.)

Grant accepted, but had doubts due to the distance from his home and the type of work performed at the Edison location.  (Doc. 21-1 at ¶ 66.)  After Grant expressed his concern about the distance and pay, the Hospital Authority increased his pay by one (1) dollar per hour.  (Doc. 13-4 at ¶ 62.)  On February 4, 2014, Grant informed the Hospital Authority that he would not accept the CNA position at the Edison location.  (*Id.* at ¶¶ 64, 66.)  The offer was extended once more to Grant in writing on February 17, 2014.  (*Id.* at ¶ 67.)  The Hospital Authority states that Grant never responded to this written offer.  (*Id.* at ¶ 68.)

The Hospital Authority received Grant's original Notice of Charge of Discrimination on March 12, 2014, which was amended on April 21, 2014.  Grant brought action against the Hospital Authority on January 22, 2015.  (*See* Doc. 1.)  Therein, he alleges the Hospital Authority violated the ADA and FMLA.  With respect to the alleged ADA violations, Grant alleges the Hospital Authority intentionally discriminated against him because of his actual or perceived disability and failed to provide reasonable accommodations.  (*See id.* at ¶¶ 14-22.)  With respect to the alleged FMLA violations, Grant alleges under theories of both interference and retaliation that the Hospital Authority failed to properly advise him of his

ability to take FMLA leave, harassed him for using his leave time, and terminated him for taking time off that was authorized and protected by FMLA.  (*See id.* at ¶¶ 23-28.)

## STANDARDS OF REVIEW

### I.  Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact.  *See Celotex*, 477 U.S. at 323; *Chapman*, 229 F.3d at 1023.  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *See Celotex*, 477 U.S. at 322-24.  Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'"  *Matsushita*, 475 U.S. at 586 (citations omitted).  Instead, the nonmovant must point

to competent record evidence that would be admissible at trial. *See also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form."). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* FED. R. CIV. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law. FED. R. CIV. P. 56(c).

**II. Local Rule 56**

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine dispute to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56. As stated above, the Parties complied with the Federal Rules of Civil Procedure and the Local Rules by filing timely motion for summary judgment, response and reply thereto, and attached a separate and concise statement of material facts. The Court will now address this ripe motion.

## ANALYSIS

The Hospital Authority seeks summary judgment on all claims raised in Grant's Complaint and asserts that no genuine dispute as to any material fact remains in this litigation that must be tried before a jury. The Hospital Authority requests of this Court to grant summary judgment in their favor with respect to Grant's claims of ADA discrimination and violation of FMLA. The Court will address each of claims in turn.

## I. Disability Discrimination Claims

The Hospital Authority seeks summary judgment with respect to Grant's disability discrimination claims on three grounds: (1) Grant failed to exhaust all available administrative remedies when he untimely filed a charge of discrimination with the EEOC; (2) under the ADA, Grant is not a "qualified individual with a disability"; and (3) he was not subject to discriminatory treatment because of an actual or perceived disability. (*See* Doc. 13-1 at 6-11.)

### A. Exhaustion of Administrative Remedies

Before a Title VII disability discrimination action can be filed in federal court, the prospective plaintiff must first exhaust all of their administrative remedies. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001); *Alexander v. Fulton Cty., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003). This requires the plaintiff to file a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice. *See generally* 42 U.S.C. § 2000e-5(e)(1); *see also Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003) ("Because Georgia is a non-deferral state, [the plaintiff is] required to file a Charge of Discrimination within 180 days of the alleged unlawful employment action."). "If a party fails to comply with the charge-filing requirement, he cannot assert a claim in court." *Sheffield v. United Parcel Serv., Inc.*, 403 F. App'x 452, 454 (11th Cir. 2010) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002)). Furthermore, "[a]n ADA plaintiff has the burden of proving all conditions precedent to filing suit, including the condition that he timely filed with the EEOC." *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001).

The Hospital Authority argues it is entitled to summary judgment on all ADA claims because Grant has not shown that his administrative remedies were exhausted prior to filing suit. Specifically, they allegedly[4] received Grant's original notice of charge of discrimination on or about March 12, 2014 and his amended notice on April 21, 2014.[5] They assert that

---

[4] The Hospital Authority references an "Exhibit 7," which is identified as "Charge of Discrimination" in Grant's deposition testimony. (*See* Doc. 17 at 3, 82.)

[5] Under 42 U.S.C. § 2000e-5(b)(1), the EEOC is required to "serve a notice of the charge . . . on such employer . . . within ten days . . . ."

Grant filed his charge of discrimination outside of the 180-day period after July 29, 2013—which is the "last date that Plaintiff may have actually worked" for the Hospital Authority. (Doc. 13-1 at 7.)  Although Grant made no response to the Hospital Authority's arguments regarding failure to exhaust in his brief, he did make some argument, albeit improperly, in his Statement of Material Facts.[6]  Grant asserts there, as well as in his Complaint, he timely filed his charge of discrimination.  (*See* Docs. 1 at ¶ 5; 21-1 at 27.)  In the Complaint, Grant alleges that the Hospital Authority failed to reasonably accommodate him and was subject to "differential treatment . . . with respect to time off and his actual and/or perceived disability," all of which "adversely affected" Grant's employment with the Hospital Authority.  (Doc. 1 at ¶¶ 16-17.)  Grant pleads that these allegedly unlawful employment practices "led, at least in part, to Plaintiff's termination."  (*Id.* at ¶¶ 20-21.)

Grant's deposition testimony reveals that the factual basis of these claims stem from the Hospital Authority not allowing him to return to his original position at his previous pay scale.  (*See* Doc. 17 at 84 ("[Y]ou didn't let me come back and get my position.  You didn't offer it back to me.  And everybody else that left there got their same position back.").)  Although Grant stated that he was refused to return to work by the Hospital Authority in both August 2013 and January 2014, he admitted that he "never expressed a desire to return to work at [the Hospital Authority] until December of 2013 or January of 2014."  (*Id.* at 89-91; Doc. 19 at 2, "Request for Admission No. 9.")  Grant even pinpointed that he suffered harm "after it was all over and [he] wasn't getting [a] check from Miller County[.]"  (*Id.* at 87.)  It is unclear whether the time when it was "all over" was when his paid leave expired on December 27, 2013, or when he was formally separated from employment with the Hospital Authority on January 8, 2014.  (*See* Doc. 13-3 at ¶¶ 19-20.)

A factual dispute exists with respect to the date of the last alleged discriminatory act committed by the Hospital Authority.  *See Morgan*, 536 U.S. at 113.  It appears from the record that the last alleged discriminatory act of refusing Grant to return to work did not occur on July 29, 2013, the day the Hospital Authority describes as Grant's "formal last

---

[6] Specifically, Grant made direct response to each of the footnotes in the Hospital Authority's Brief in Support of its Motion for Summary Judgment in "Part III" of his Statement of Material Facts.  (*See* Doc. 21-1 at 18-34.)  While the Court cannot recall any previous cases with responses to material facts made with this much tenacity, it would prefer if the Parties make their legal arguments in their briefs and not in their statement of facts.

date" of employment.   Rather, the record reflects that the apparent refusal of Grant's reinstatement by the Hospital Authority occurred sometime in December 2013 or January 2014.   Whether or not the 180-day period ran from December 2013 or January 2014, it would appear that Grant indeed filed a timely charge of discrimination and exhausted his administrative remedies.   Thus, viewing the evidence and all factual inferences most favorably to Grant, the Court is unpersuaded with the Hospital Authority's argument and will decline to grant summary judgment on the basis of Grant's alleged failure to exhaust his administrative remedies.

### B.  Qualified Individual with a Disability

The ADA protects individuals from employment discrimination on the basis of their actual or perceived disability.  *See* 42 U.S.C. § 12112(a).  To establish a prima facie case for disability discrimination under the ADA, a plaintiff must show they were (1) disabled,[7] (2) a qualified individual, and (3) was the subject of unlawful discrimination because of their disability.  *See Earl v. Merryns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). 42 U.S.C. § 12112(a). As the statute indicates, only *qualified* individuals are entitled to ADA protection.  *See* 42 U.S.C. § 12112(a).   Such individuals are those "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."   42 U.S.C. § 12111(8).   Essential functions are those "fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1).

The ADA does not require employers to eliminate essential job functions of employment to accommodate individuals with disabilities.  *See Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *but see Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007) ("the ADA may require an employer to restructure a particular job by altering or eliminating some of its *marginal* functions." (quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001) (emphasis in original))). Thus, if an individual cannot perform the essential functions of his employment "even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA."  *D'Angelo*

---

[7] The Parties do not dispute as to whether Grant was disabled for purposes of his ADA claims.

*v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005) (quoting *Davis*, 205 F.3d at 1305 (internal quotation marks omitted)).

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability[.]" *Lucas*, 257 F.3d at 1255; *see also* 42 U.S.C. § 12112(b)(5)(A). However, "an employer is only required to make a reasonable accommodation when such accommodation will enable the employee to perform the essential functions of the job." *McCollough v. Atlanta Beverage Co.*, 929 F. Supp. 1489, 1499 (N.D. Ga. 1996). When determining whether a function is "essential" to an employment position, the Court must evaluate the job function "on a case-by-case basis by examining a number of factors." *Davis*, 205 F.3d at 1305. Consideration must be given to the "employer's judgment as to what functions of a job are essential[.]" 42 U.S.C. § 12111(8). And while "'the employer's view is entitled to substantial weight in the calculus,' this factor alone may not be 'conclusive[ ].'" *Holly*, 492 F.3d at 1258 (quoting *D'Angelo*, 422 F.3d at 1233).

The ADA regulations provide several factors to identify whether a job function may be considered "essential." *See* 29 C.F.R. § 1630.2(n). These factors include (1) if "the reason the position exists is to perform that function," (2) there is a "limited number of employees available among whom" can perform the job function, and (3) if the function is so "highly specialized" that the person in the position "is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2)(i)-(iii). Other factors such as the employer's judgment regarding which functions are essential, the amount of time expended on the job performing the function, or the consequences of not requiring the employee to perform the function may be considered as evidence of whether a particular function is essential. *See* 29 C.F.R. § 1630.2(n)(3).

The Hospital Authority contends that Grant is not a qualified individual with a disability because he could not perform any of the essential functions of his employment position during the leave period in which he could not work at all. They argue that when Dr. Roy Reardon, Grant's treating provider,[8] formally took Grant out of work on July 26,

---

[8] Throughout his response brief, Grant repeatedly suggests that Dr. Reardon's note was somehow engineered or otherwise fraudulent and intended to force Grant out of the workplace. Grant also attempts to infer that

2013, he could perform none of the essential functions of his employment during that time. (*Compare* Doc. 13-3 "Exhibit E" *with* "Exhibit G".)   They also rely on Grant's own statements that indicate that the Performance Improvement Plan were all part of his job responsibilities and that his poor vision interfered with his job performance.

To counter the Hospital Authority's attempt to deem their former employee ineligible for ADA protection, Grant maintains that the Hospital Authority failed to offer any reasonable accommodation to assist him in performing the essential functions of his employment.   It was the Hospital Authority's responsibility, so argues Grant, to initiate the interactive process with Grant to determine whether a reasonable accommodation would be feasible.   Grant also states that the Hospital Authority could have accommodated him by modifying his job duties, but chose not to do so.

Grant's arguments are unavailing and his ADA claims cannot survive summary judgment.   "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl*, 207 F.3d at 1367 (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997)).   When the employee fails to identify a reasonable accommodation, "the employer has no duty to engage in the 'interactive process.'" *Emanuel v. Hosp. Auth. of Valdosta*, No. 7:14-CV-108 (HL), 2016 WL 707429, at *8 (M.D. Ga. Feb. 22, 2016).   The record in this case provides no indication that Grant requested any accommodation to assist him.   When asked whether or not he directly asked the Hospital Authority provide him with any reasonable accommodation, Grant's response was, "They did that on their own." (Doc. 17 at 61.)   Thus, and according to Eleventh Circuit case law, Grant cannot argue that the Hospital Authority failed to provide him reasonable accommodation because he did not fulfill his duty of requesting an accommodation at the outset or otherwise.

---

Dr. Reardon is not his doctor, but an employee of the Hospital Authority tasked with taking Grant out of work.   The Court does not accept this attempt to create a fact issue because at the initiation of this case, it was Grant who alleged that he took medical leave "under *his doctor's orders* for surgery" in July 2013. (Doc. 1 at ¶ 8 (emphasis added).)   Grant further confirmed that Dr. Reardon was his regular treating provider throughout his August 28, 2015 deposition. (*See* Doc. 17 at 51, 54, 56.)   Thus, there is no genuine issue of material fact regarding Dr. Reardon's role as Grant's physician.

Notwithstanding the failure to request an accommodation, the record also shows an additional reason why Grant is not a qualified individual with a disability.  During the period in which Grant was not permitted to work under doctor's orders, he was unable to perform the essential functions of Housekeeping Supervisor for the Hospital Authority.  It is undisputed that Grant's position was integral for the Hospital Authority to maintain its accreditation as a critical access hospital so that it may participate in the Medicare program.  Grant's position was also important for keeping a clean, disease-free hospital.  The consequences of failing to maintain a clean facility could quite literally become a matter of life or death.  Therefore, an employee in Grant's former position cannot be entirely absent from the job for months at a time and perform the aforementioned essential functions of employment.  These job functions include supervising and managing as many as fourteen (14) individuals to ensure the hospital is at all times clean, following up behind those individuals to confirm that their tasks were properly completed, performing janitorial duties throughout the entire hospital campus, and training new hires and current employees on best practices.  The Court finds that these functions are fundamental, and thus essential, job duties of the employment position of Housekeeping Supervisor.

Not only can an individual not perform these tasks if they are not present, but they cannot perform these tasks if they are unable to adequately see.  Although Grant is unwilling to admit by way of argument that his vision problems affected his job performance, his own words state otherwise.[9]  He admitted that when his sugar levels were high, he could not see and could not perform his job duties.  To compensate for his vision problems, he would get by through feel, habit, and routine.  However, his daily routine, upon the existing record, could not "get by" the rigorous inspection of the DNV Survey.  These undisputed facts and the above stated reasons show there is no genuine dispute as to any material fact that Grant is not a qualified individual with a disability because he could not perform the essential job functions of his employment position and no reasonable juror could find otherwise.  Other

---

[9] Within Plaintiff's Statement of Material Facts, specifically Part III, Grant moves to strike the Hospital Authority's brief and supporting affidavits to the extent it conflicts with Grant's evidence and relies on *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-151 (2000).  (Doc. 21-1 at 20-21.)  Essentially, Grant requests this Court to disregard all evidence favorable to the moving party the jury is not required to believe.  He makes this request based on the disputed issue of whether or not he was able to perform his duties, while experiencing his vision problems.  The Court has thoroughly reviewed the record in this matter and finds that none of the evidence in this case rises to this level, and accordingly, rejects Grant's request.

than his statement that he could "get by," there is no record evidence to support such a finding.   Accordingly, the Hospital Authority is entitled to judgment as a matter of law on Grant's ADA claims.   The Court could end its analysis here.   However, in order to render a full and complete decision, the Court will also assess whether Grant was subjected to unlawful discriminatory treatment due to his disability.

**C. Discriminatory Treatment**

It is unlawful to limit an employee in any manner that would adversely affect their opportunities or employment status simply because of their disability.   *See* 42 U.S.C. § 12112(b)(1).   The Hospital Authority contends that there is no evidence on the record that Grant was treated poorly because of his vision problems.   They rely on the timeline of events, between the July 12, 2013 meeting and the second offer of employment on February 17, 2014, to show that Grant was not treated unfairly or with discriminatory intent, as alleged in the Complaint.   Grant provided no argument in response other than conclusively stating that he was forced out of the workplace and was not allowed to return to his original position because of his disability.

Upon independent review of the record, the Court finds there is no genuine dispute as to any material fact as to whether Grant was subject to any unlawful discriminatory treatment because of his disability.   The Complaint and record reveals that Grant felt slighted because he was not allowed to return to his original position and offered a lower-paying position at an undesirable location.   However, the record shows that Grant voluntarily did not return to his position after his leave expired on December 27, 2013 and he was medically cleared to return to work on January 7, 2014.   Additionally, it was Grant who returned to the Hospital Authority, submitted an application for reemployment, agreed to work as a CNA, and initially accepted the position in Edison, Georgia.   When concerns about paying for travel to and from Edison arose, the Hospital Authority increased his proposed pay by one dollar per hour.   This was agreeable until February 4, 2014 when Grant decided to not accept the CNA position at the Edison location.   The Hospital Authority reoffered the position to Grant, but they contend that Grant never responded.   Taken together and based on the allegations against the Hospital Authority, no reasonable juror upon this record could find that Grant was subject to any unlawful discriminatory treatment.

Grant has pointed to no record evidence of discrimination or any appropriate comparators treated differently.   Notwithstanding the above finding on Grant's status as a qualified individual with a disability, which the Court determined Grant has not established, the Hospital Authority is entitled to summary judgment on Grant's disability discrimination claims based on the lack of evidence of unlawful discriminatory treatment.[10]

## II. Violation of FMLA Claims

Under FMLA, any eligible employee[11] is entitled to take up to twelve (12) weeks of leave within a twelve (12) month period and, upon their return, be restored to their original or an equivalent position.   *See* 29 U.S.C. § 2612(a); 29 U.S.C. § 2614(a).   Two claims are recognized as violations to FMLA: interference claims and retaliation claims.   *See O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2000).   Interference claims rest on whether an employer unlawfully burdens or denies substantive statutory rights entitled to the employee, while retaliation claims depend on whether an employer terminates an employee for exercising their FMLA rights.   *Id.*   Grant brings claims of both interference and retaliation against the Hospital Authority.   (*See* Doc. 1 at ¶ 24.)   The Hospital Authority now moves for summary judgment as to both claims.

### A. Interference Claim

Pursuant to 29 U.S.C. § 2615(a)(1), "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by FMLA.   "To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001).   The employer's motive or intent is irrelevant to this inquiry.   *Id.* at 1208. Grant alleges the Hospital Authority interfered with his FMLA right in the following ways: (1) by failing to properly advise or notify him of his right to take FMLA leave, (2) by

---

[10] Grant also asserts that summary judgment on his ADA claims is inappropriate because Grant suffered a hostile work environment.  Grant has never alleged any claim for hostile work environment.  (*See* Doc. 1.) His argument that the Hospital Authority cannot assert an affirmative defense against this claim is correct because it was never pleaded in his Complaint.  *See* FED. R. CIV. P. 8(c).

[11] It is undisputed that Grant was an eligible employee and had a qualifying reason to take leave under FMLA. *See* 29 U.S.C § 2612(a)(1)(D) (serious health condition that prevents the employee from performing their duties).

harassing him when he used his leave time, and (3) by terminating him after he took authorized and protected leave. (*See* Doc. 1 at ¶ 24.)

    *1. Notice*

    The Hospital Authority argues it is entitled to summary judgment on all of Grant's interference claims. As to the first claim, the Hospital Authority asserts that no private right of action exists for the alleged violation of the notice requirement. FMLA requires employers to post notices that inform employees of their FMLA rights and how to file a charge. *See* 29 U.S.C. § 2619(a). The penalty for violating this notice requirement is a civil monetary penalty not exceeding $100 for each offense. *Id.* at § 2619(b). While some courts have found that no private right of action exists for violation of § 2619(a), *see Jessie v. Carter Health Care Center, Inc.*, 926 F. Supp. 613, 617 (E.D. Ky. 2012); *Cormier v. Littlefield*, 112 F. Supp. 2d 196, 200 (D. Mass. 2000), others have found it conceivable that a violation of the notice requirement in § 2619(a) could result in a violation of an employee's substantive rights under § 2615(a). *See Mena-Valdez v. E.M. T-Shirts Distrib., Inc.*, 878 F. Supp. 2d 357, 361-63 (D. P.R. 2012) (citing cases).

    In *Mena-Valdez*, it was undisputed that the employer violated § 2619(a) by failing to post conspicuous notice to apprise its employees of their rights under FMLA. 879 F. Supp. 2d at 362-63. The district court determined there was a genuine dispute of material fact with respect to whether the employee was prejudiced by the employer's failure to provide notice of FMLA rights. *Id.* at 363. Although there is no Eleventh Circuit precedent on this issue, the Court is persuaded by the reasoning in *Mena-Valdez* that an employee's substantive rights under § 2615(a) could be violated by an employer's failure to provide adequate notice under § 2619(a). Thus, the Hospital Authority is not entitled to summary judgment on this ground.

    However, the Hospital Authority argues in the alternative that the record reflects their compliance with the FMLA notice requirement. The record shows that the Hospital Authority provided employee handbooks, which included a statement regarding leave available under FMLA, and placed posters with information concerning employees' FMLA rights in common areas of the facility, including where Grant was predominately assigned to work. (*See* Doc. 13-3 at ¶¶ 6-8.) It is undisputed that Grant received the employee handbook on October 2, 2009 and was aware of the Hospital Authority's FMLA policy. (*Id.*

at ¶ 6; Doc. 19 at 1, "Request for Admission No. 5".)   Grant also acknowledged that an FMLA poster was posted in the facility.

Grant disputes, but does not point to any record evidence, the Hospital Authority's compliance with FMLA's notice requirement.   Grant asserts that the Hospital Authority failed to provide both "general notice" and "specific eligibility notice" to him prior to his departure.   General notice, as contemplated by Grant, pertains to the regulations that require posters and handbooks that notice employees of their FMLA rights and cites 29 C.F.R. § 825.300(a).   However, as noted above, Grant has not directed the Court to any competing evidence to overcome the Hospital Authority's unchallenged record evidence.   *See Penalty Kick Mgmt. Ltd. v. Coca-Cola Co.*, 164 F. Supp. 2d 1376, 1378 (N.D. Ga. 2001) ("The unsupported, self-serving statements of the party opposing summary judgment are insufficient to avoid summary judgment.").   At most, Grant makes reference to a 2013 poster, but provides no further detail as to its import to this present action.[12]   Moreover, Grant's contentions that he was not provided general notice are wholly contradicted by the record evidence, including his own admissions, in this case.   Thus, the Court rejects Grant's arguments as to general notice.

With respect to Grant's claim that he was not directly notified of his specific FMLA rights, the Hospital Authority interpreted this interference claim as a failure "to notify [Grant] that his FMLA leave would run concurrently with his paid leave." (Doc. 13-1 at 13.) Grant confirms that he was not notified and consequently denied the right to take intermittent leave to best suit his needs and could have avoided "burn[ing] off twelve weeks of leave at one time." (Doc. 21 at 4.)   The Hospital Authority advances that this claim fails as a matter of law because FMLA permits employers to require its employees to substitute any of the "accrued paid vacation leave, personal leave, or medical or sick leave" for any part of the 12-week FMLA period by statute.   29 U.S.C. § 2612(d)(2)(B).

Employees entitled to leave because of a serious health conditions may take their FMLA leave intermittently.   *See* 29 U.S.C. § 2612(b)(1).   However, in *Ragsdale v. Wolverine*

---

[12] Though unclear, the Court presumes the 2013 poster pertains to the same posters Karie Spence mentioned in her sworn affidavit.  The Court could infer that Grant seeks to argue that the posters were posted in 2013, but even so, the record is not in dispute that Grant worked at the Hospital Authority through July 12, 2013. Without more, this mere mention of a 2013 poster is insufficient to overcome summary judgment.

*World Wide, Inc.*, 535 U.S. 81 (2002), the Supreme Court of the United States determined that the FMLA statute did not require employers to give individualized notice as to how FMLA leave will be designated when the FMLA regulations provided otherwise.  *See id.* at 95-96.  In that case, the employer provided the employee with thirty (30) weeks leave, but when they denied her additional leave, she sued her employer for violating FMLA.  *Id.* at 84.  Relying on an FMLA regulation, the employee argued she was entitled to an additional twelve (12) weeks of leave because the employer failed to specifically notify her that her 30-week leave would also encompass her statutory FMLA leave.  *Id.*  Although the Court agreed that the regulation supported the employee's claim, the Court found the regulation contrary to the Act and beyond the Secretary of Labor's authority because it could not only provide more leave than required under the statute, but it also penalized employers disproportionately and inconsistently with Congress's intent.  *Id.* at 95.  The Court further found that the employee could not show that she would have taken less or intermittent leave had she received individualized notice.  *Id.* at 90.  It specifically noted that her physician did not clear her to work until well after her 30-week leave period expired.  *Id.*

The instant case requires the same result.  It is undisputed that Grant received more than twelve (12) weeks paid leave.  It is also undisputed that Grant's treating provider removed him from work on July 26, 2013 and was reinstated by another physician on January 7, 2014 due to his medical condition.  Grant's assertion that he would have taken leave intermittently had he received notice is unavailing because it is undisputed that intermittent leave, according to his treating provider, was not an option.  Like the *Ragsdale* employee, he would not have been able to return to work because he was taken out of work by treating provider beyond the protected 12-week period.  Moreover, the Hospital Authority was not in violation of the FMLA when it exercised its statutory right to run Grant's paid leave concurrently with his FMLA leave.  *See* 29 U.S.C. § 2612(d)(2)(B).  The Hospital Authority's right to run employees' paid leave concurrently with their FMLA leave is also noted in the employee handbook Grant acknowledged that he received on October 2, 2009.  Because no genuine issue of material fact exists, the Hospital Authority is entitled to judgment as a matter of law on the notice issue.

### 2. *Harassment*

Grant claims that he was harassed for taking FMLA leave. The Hospital Authority states that the record is devoid of any evidence of harassment, which entitles them to judgment as a matter of law. Grant provided no response.[13]  As provided above, it is unlawful for an employer to interfere with or restrain their employee's right to exercise their FMLA rights. *See* 29 U.S.C. § 2615(a)(1). The record does not reflect any direct evidence indicating that Grant was harassed in any way by the Hospital Authority for taking leave. The Hospital Authority again notes that Grant was provided with twenty-two (22) weeks of paid leave. When Grant's paid leave expired and he was no longer receiving compensation from the Hospital Authority, he understandably felt pressure. He had to maintain his household, pay bills, and put his daughter through college. It was unthinkable for him to start over this late in life. Even so, the facts presented do not reflect harassment, interference, or restraint on the part of the Hospital Authority. Grant only notes the effects of unemployment. Nothing in the record shows that Grant was prevented from taking FMLA leave and no reasonable jury upon the facts shown and presented to the Court could find otherwise. Thus, summary judgment is warranted as a matter of law in favor of the Hospital Authority on this ground.

### 3. *Reinstatement*

Lastly, the Hospital Authority moves for summary judgment against Grant's claim that his FMLA rights were violated when he was terminated for "taking time off that was authorized and protected under the FMLA." (*See* Doc. 1 at ¶ 24.) The Hospital Authority contends it is entitled to summary judgment because Grant had no right to be restored to his prior position or its equivalent. Grant responds that his leave never began, and thus, he could not have utilized the entirety of his FMLA leave and could have been returned to his prior position. Grant assures this Court that this in an "obvious" act of interference. The "obvious" is apparently unobvious to the Court. The Court also will not permit Grant to

---

[13] The Court could end its assessment here and deem Grant's claims of harassment abandoned. *See Dalton v. Geico Annuity & Ins. Co.*, No. 7:08-CV-130 (HL), 2010 WL 2640097, at *8 (M.D. Ga. June 28, 2010) (citing *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants entry of summary judgment for the opposing party.")). Notwithstanding that apparent authority to do so, the Court finds it important to give Grant its thorough reasoning as to whether or not he is entitled to a trial.

assert for the first time at this stage of the litigation that he was never on FMLA leave. The very nature of his claims are premised on his taking FMLA leave and allegedly suffering harm for exercising his FMLA rights. Therefore, the Court rejects Grant's inference that he was never on FMLA leave. (*Compare* Doc. 1 at ¶ 24 *with* Doc. 21 at 2.)

Employees who take FMLA leave, like Grant, are entitled to the right to be restored to their former or equivalent position upon their return. *See* 29 U.S.C. § 2614(a)(1). Nonetheless, this right is lost when the employee simply does not return to work within the protected 12-week period. *See, e.g.*, *McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999) (finding that an employee absent for fifteen (15) weeks was not entitled to be restored to her prior or similar position). The record reveals that Grant's FMLA leave began on July 29, 2013 and expired twelve (12) weeks later on October 21, 2013. (Doc. 13-3 at ¶ 17.) The Hospital Authority placed Grant on paid leave through December 27, 2013. (*Id.* at ¶ 16, 19.) When Grant did not return to work, the Hospital Authority formally separated Grant from employment on January 8, 2014. (*Id.* at ¶ 20.)

Grant testified that he attempted to return to work in August 2013, but was refused. (*See* Doc. 17 at 117:8-20.) Yet, his own admissions state that he did not attempt to return to work until December 2013 or January 2014. (Doc. 19 at 2, "Request for Admission No. 9".) Additionally, Karie Spence only received one doctor's note from Grant indicating that he had been released to return to work. (Doc. 13-3 at ¶ 22.) This note was dated January 7, 2014. (*See id.* at 135.) The Hospital Authority further notes that their employee handbook describes "Job Abandonment" as the following: "Failure to report to work 2 consecutive days . . . without any notice will be deemed a voluntary termination of the employee." (*Id.* at 101-102.) Even viewing the record evidence in a light most favorably to the nonmoving party, as the Court is required to do, no reasonable juror could find upon the facts shown by the record that Grant was entitled to be restored to his former or equivalent position when he was absent from his job well beyond the 12-week protected period. Thus, the Hospital Authority is entitled to summary judgment on Grant's claim of interference. *See McGregor*, 180 F.3d at 1308 ("Where an employer such as defendant exceeds the baseline 12 weeks by providing not only more leave than FMLA but also paid leave, the employer should not find itself sued for violating FMLA.").

**B. Retaliation Claim**

To successfully establish a claim for retaliation, "an employee must demonstrate that his employer *intentionally* discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207 (emphasis added). *See also* 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."). "Unlike an interference claim, an employee 'bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus.'" *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1267-68 (11th Cir. 2008) (quoting *Strickland*, 239 F.3d at 1207). "[U]nless there is direct evidence of the employer's retaliatory intent," courts within this Circuit apply the *McDonnell Douglas* burden-shifting framework to FMLA retaliation claims. *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

First, the employee must show "(1) he engaged in statutorily protected activity; (2) he experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). Should the employee make out a *prima facie* case, the burden then shifts to the employer to "articulate a legitimate reason for the adverse action." *Smith v. BellSouth Telecomm., Inc.*, 273 F.3d 1303, 1314 (11th Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 802). If the employer offers a legitimate, nondiscriminatory reason for the adverse action, the employee must rebut that stated reason by showing that it was, in fact, pretextual. *Id.*

Upon review of the record, the Court does not find, nor have the Parties identified, any direct evidence of retaliatory intent. The Eleventh Circuit has defined "direct evidence" as evidence reflecting "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks omitted). "As our precedent illustrates, direct evidence is composed of 'only the most blatant remarks, whose intent could

be nothing other than to discriminate' on the basis of some impermissible factor." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).  At most, the record only shows the Hospital Authority formally separating Grant from employment on January 8, 2014.  The Court finds that this record evidence alone does not amount to direct evidence of discriminatory or retaliatory intent.  Accordingly, in addition to determining whether the Hospital Authority is entitled to summary judgment, the Court must also assess whether Grant can establish a *prima facie* case of retaliation under the *McDonnell Douglas* framework.

"The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of causal connection." *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  The employee's burden construed "broadly" in that they must merely "prove that the protective activity and the adverse action are not completely unrelated." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (alterations and internal quotation marks omitted); *Caldwell v. Clayton Cty. Sch. Dist.*, 604 F. App'x 855, 860 (11th Cir. 2015) (accord).  However, the temporal proximity between the protected activity known to the employer and the adverse employment action must be a "*very* close" one. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (emphasis added).  Therefore, if there is a "substantial delay" between the two acts, "in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon*, 393 F.3d at 1220. *See, e.g.*, *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) ("three and one-half month temporal proximity is insufficient to create a jury issue on causation."); *but see Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (seven weeks sufficient timeframe to create the causal nexus necessary to establish a prima facie case for retaliation).

The Hospital Authority argues that Grant is unable to make out a *prima facie* case for retaliation because he cannot establish a causal connection between the protected activity (here, taking FMLA leave) and the adverse employment decision (here, termination of

employment).  The Hospital Authority asserts Grant took FMLA leave on July 26, 2013, which expired on October 21, 2013, and the Hospital Authority formally separated Grant from employment on January 8, 2014 when he failed to return to work.  Essentially, they argue that no causal connection exists because the temporal proximity between Grant's protected activity and the Hospital Authority's decision to terminate employment was attenuated and wholly unrelated to Grant taking FMLA leave.  In response, Grant states that even if his FMLA leave ended on October 21, 2013, his termination of employment on January 8, 2014 is a sufficiently close period of time to allow an inference of retaliation based on temporal proximity alone.  Grant also states, without citation, that Eleventh Circuit precedent supports this assertion.

Relying on *Johnson v. Morehouse College, Inc.*, 199 F. Supp. 2d 1345 (N.D. Ga. 2002), the Hospital Authority asserts they not only complied with FMLA, but they also provided Grant with paid leave in excess of the requisite twelve-week period.  In *Johnson*, plaintiff asserted an FMLA retaliation claim against her employer when she was terminated over five (5) months after her leave began.  *Id.* at 1359.  However, it was undisputed that the plaintiff had not returned to work at the time of her termination.  *Id.* at 1351.  She alleged her employer "retaliated against [her] by failing to return her to the same position that she held when [her FMLA] leave commenced."  *Id.* at 1359.  In granting the employer's motion for summary judgment, the district court found no causal connection between the plaintiff's statutorily protected activity and her termination because even after plaintiff refused to return to work, she was fired over two months after her leave expired.  *Id.* at 1361-62.

Here, Grant similarly received paid leave beyond the statutory twelve-week period and was ultimately terminated when he did not report to work.  Grant also raises retaliation allegations against the Hospital Authority and claims he was "denied rights and benefits conferred by the FMLA and was terminated after taking protected leave."  (Doc. 1 at ¶ 26.) However, the Court finds the temporal proximity between Grant taking FMLA leave on July 26, 2013 and his termination on January 8, 2014 alone presents a substantial distance in proximity that warrants the grant of summary judgment.  No reasonable jury could find that a period of over five (5) months between the two acts creates an inference of a causal connection that links Grant's taking FMLA leave and his eventual termination.  Moreover,

Grant presents no additional evidence outside of the timeframes between the protected conduct and the adverse employment action to create a factual dispute as to causation. The Court further finds the temporal proximity between the expiration of Grant's FMLA leave, or October 21, 2014, and the date of his termination is also too tenuous of a period to reasonably infer the Hospital Authority retaliated against Grant. Like the employer in *Johnson*, the Hospital Authority ended its employment relationship with Grant nearly three months after his leave expired and after Grant did not return to work. Grant points to no other record evidence of discriminatory intent on the part of Hospital Authority. Accordingly, the Hospital Authority is entitled to summary judgment as a matter of law as there is no genuine dispute as to any material fact as to Grant's retaliation claim.[14]

## CONCLUSION

For the reasons stated above, Defendant Hospital Authority of Miller County's Motion for Summary Judgment (Doc. 13) is **GRANTED** and Defendant's Request for Oral Argument (Doc. 20) is **DENIED AS MOOT.** Judgment shall be entered in Defendant's favor and against Plaintiff Burnell Grant.

**SO ORDERED**, this ___30th___ day of September, 2016.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

---

[14] Though unrelated to the retaliation analysis, the Court notes that few instances of retaliation involve the alleged wrongful employer offering the aggrieved employee an employment opportunity shortly after termination. Moreover, these facts support the Hospital Authority's defense that its adverse employment action against Grant was for nondiscriminatory reasons which Grant does not rebut with evidence of pretext. In this case, Grant was twice offered employment with the Hospital Authority at its Edison, Georgia location. (*See* Doc. 13-3 at ¶¶ 22, 25.) He was even offered a raise to alleviate his concern with distant travel, but still refused the Hospital Authority's offer. (*See* Doc. 13-2 at ¶ 28.) The Court notes, but does not find, these facts as strong indicators that Grant was neither harassed nor retaliated against for taking FMLA leave, as alleged in his Complaint. Nevertheless, they support the Hospital Authority's assertion of lack of discriminatory intent.